Brian M. Cige, Esq.
LAW OFFICES OF BRIAN M. CIGE
7 East High Street
Somerville, New Jersey 08876
(908) 685-3775
cigelaw@gmail.com
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHERYL EDWARDS and JON EDWARDS,<br><br>                              Plaintiffs,<br><br>      -against-<br><br>MICHIGAN STATE UNIVERSITY and JOHN DOES 1-10,<br><br>                              Defendants. | Civil Action No.<br><br>**COMPLAINT and JURY DEMAND** |

NOW COMES Plaintiffs, by and through their attorney, Brian M. Cige, Esq., and hereby allege the following:

1.      Jon Edwards was a PhD candidate from 1975 to 1982 at Michigan State University ("MSU") studying under its Professor Harold G. Marcus (hereafter "Marcus") in the Department of History.

2.      Cheryl Edwards was an undergraduate student at MSU from 1975 to 1980 and an MSU employee thereafter.

3.      Cheryl and Jon met at MSU.

4.      Plaintiffs both currently reside in the Township of Hopewell, County of Mercer and State of New Jersey.

5.      Marcus used his position as Jon's advisor to control and stymie Jon's progress towards his degree while sexually harassing him about Cheryl, wielding that influence to sexually harass and assault her.

6.      This is a civil action for redress for injuries sustained by Plaintiffs as a result of Marcus's misconduct, all of which was enabled by MSU.

7.      Marcus used his position of trust and confidence in an abusive manner causing Plaintiffs to suffer a variety of injuries including shock, humiliation, emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, disgrace, and loss of enjoyment of life.

8.      In September 2016, the Indianapolis Star reported on a complaint filed with MSU's Police Department involving Larry Nassar.  The story headline read "Former USA Gymnastics Doctor Accused of Abuse." The complaint included allegations that MSU had not properly responded to claims of sexual abuse.

9.      Following the September 2016 publication, other victims began coming forward after recognizing that they were victims of sexual abuse occurring within a deeply flawed institutional framework, both inside MSU's Athletics Department and elsewhere in the university community that condoned such behavior and empowered the bad actors.

10.      As early as the mid-seventies, MSU representatives were made aware of rampant sexual misconduct within the History Department yet failed to appropriately respond to allegations, resulting in the sexual assault, abuse, and molestation of victims through approximately 2003.

11.     MSU's deliberate indifference before, during, and after the sexual harassment, assault, abuse, and/or molestation of Plaintiffs was in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, 42 U.S.C. § 1983, as well as other Federal and State laws.

12.     MSU's failure to properly supervise Marcus and its negligence in retaining Marcus was in violation of Michigan common law.

13.     MSU's failure to act properly in investigating sexually based claims against Marcus severely compromised the safety and health of Plaintiffs and has been devastating for Plaintiffs and their family.

14.     This action arises from Defendants' blatant disregard of Plaintiffs' federal and state rights, and Defendants' deliberately indifferent and unreasonable response to professor-on-student sexual harassment, assault, abuse, molestation, and oppression.

## JURISDICTION AND VENUE

15.     Plaintiffs herby repeats and realleges the allegations contained in the previous paragraphs of the Complaint and fully incorporate them as set forth in length.

16.     Defendant MSU is in the city of East Lansing, County of Ingham and State of Michigan, other Defendant's principally reside as well.

17.     This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq., as more fully set forth herein.

18.     This is also an action to redress the deprivation of Plaintiffs' constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

19.     Subject matter jurisdiction is founded upon 28 U.S.C. § 1331, which gives District Courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

20.     Subject matter jurisdiction is also founded upon 28 U.S.C. § 1343, which gives District Courts original jurisdiction over any civil actions authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

21.     Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

22.     The claims are cognizable under the Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681 *et seq*., and under Michigan Law.

23.     The events giving rise to this lawsuit occurred in Ingham County, Michigan and Eaton County, Michigan both of which sit in the Southern Division of the Western District of Michigan.

24.     Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the injuries resulting from the misconduct have been suffered by Plaintiffs.

## PARTIES AND KEY POLICIES

25.     Plaintiffs herby repeat and reallege the allegations contained in the previous

paragraphs of the Complaint and fully incorporate them as set forth in length.

26.     Harold G. Marcus was formerly a Professor of History, specializing in African

history at MSU from 1968 to 2003.

27.     MSU was at all relevant times and continues to be a public university organized

and existing under the laws of the State of Michigan.

28.     MSU has received and still receives federal financial assistance and is therefore

subject to Title IX.

29.     At all relevant times, MSU and Marcus were acting under color of law, to wit,

under color of statutes, ordinances, regulations, policies, customs, and usages of the State of

Michigan and/or MSU itself.

30.     MSU specifically had two policies applicable to these facts on their face:  MSU's

1971-1973 Anti-Discrimination Policy ("1971-1973 Policy") and MSU's 1980 Anti-

Discrimination Policy ("1980 Policy").

31.     The 1971-1973 and 1980 Policies both apply to the following:

   a. All educational, cultural, and social activities occurring on the Michigan State
      University campus.
   b. University-sponsored programs occurring off-campus, including cooperative
      extension, adult education and any regularly scheduled classes.
   c. Housing supplied or regulated by the University for students and staff,
      including fraternities and sororities.
   d. Employment relations between the University and its employees.

32.     Article II.A of the 1971-1973 Policy prohibits the following:

   a. Disparity of treatment in employment, job placement, promotion or other
      economic benefits on the basis of race, creed or ethnic origin.

b. Limitation of access to residence, or to participation in educational, athletic, social, cultural or other activities of the University because of race, creed, or ethnic origin.
c. Discrimination of the foregoing types on the basis of sex, unless based on bona fide job requirements or generally accepted and socially approved distinctions in housing, sanitary facilities, athletics and similar facilities or activities.
d. Harassment based on race, creed, ethnic origin, or sex.

33.   Article II.A of the 1980 Policy prohibits the following:

a. Disparity of treatment in employment, job placement, promotion or other economic benefits on the basis of race, creed, ethnic origin, sex, age, political persuasion or sexual preference.
b. Limitation of access to residence, or to participation in educational, athletic, social, cultural or other activities of the University because of race, creed, ethnic origin, sex, age, political persuasion or sexual preference.
c. Harassment based on race, creed, ethnic origin, sex, age, political persuasion or sexual preference.

34.    At all relevant times, Marcus was acting in the scope of his employment or agency with MSU as one of its tenured Professor.

35.   As part of Marcus's employment and contractual duties with MSU, Marcus was to instruct doctoral and post-doctoral students in pursuit of advanced degrees, such as Plaintiffs.

**SPECIFIC FACTUAL ALLEGATIONS AS TO CHERYL EDWARDS**

36.   Plaintiffs herby repeat and reallege the allegations contained in the previous paragraphs of the Complaint and fully incorporate them as set forth in length.

37.   In 1975, Marcus was a respected professor of African History at MSU specializing in Ethiopia.

38.   During the relevant time period, Marcus in appropriately and illegally repeatedly bragged of his sexual exploits, questioned Jon routinely about his sex life, and made lascivious comments regarding Cheryl and other women students to Jon.

39.     Unbeknownst to Jon, at that time, during this same time frame, Marcus sexually assaulted, abused, and molested Cheryl by engaging in nonconsensual sexual touching, assault, and harassment.

40.     Marcus began paying attention to Cheryl in 1976 when she enrolled in African Studies as a minor during her undergraduate program as she was interested in East Africa and took a course with Marcus.

41.     Cheryl was raised in a traditional Catholic household and had little sexual experience by this time. By contrast, in Cheryl's eyes, Marcus was worldly and exuded sexuality in his lectures.

42.     Marcus seemed to want to be a mentor to Cheryl and paid an increasing amount of attention to her.  Cheryl originally attributed this to her being a good student and to Marcus believing that she would make a good graduate student in this field.

43.     As time went on, however, Marcus began commenting on Cheryl' clothing. And initiated physical contact, occasionally tapping or grabbing her shoulder.

44.     Marcus ratcheted up his attentions dramatically during one of Cheryl's visits to Marcus's office during office hours, perhaps during her junior year.  Cheryl had visited Marcus's office multiple times before.  On this occasion she planned to speak with him regarding the topic of a research assignment.

45.     Marcus's office was in Morrill Hall.   It was located well in the rear of the building and somewhat isolated.

46.     After Cheryl arrived at Marcus's office, Marcus told her he wanted to show her a book, drawing her further into the office.  Marcus then closed the door behind her.  Quickly,

Marcus grabbed Cheryl, kissed her, groped her and exposed his genitals while pushing her against a wall.  Marcus said, "I really want to have sex with you."

47.     Initially, Cheryl froze as she did not know what to do.  She thought she would vomit. Because of her Catholic upbringing, it crossed her mind instantly that she had committed some sin and wondered what she had done to motivate Marcus to do this to her.

48.     Cheryl told Marcus "no" and repeatedly told him she needed to leave.  She then walked out of his office.

49.     Cheryl felt petrified and was traumatized, for a while, blamed herself for the incident. She decided to do her best to put these incidents behind her.

50.     After some time passed, Marcus began calling Cheryl and saying things like, "Please come over. I'd like to have sex with you." This happened several times.

51.     Cheryl worried that her grades might depend on whether she had sex with Marcus, but she continued rebuffing his advances. Cheryl began experiencing anxiety and suffering from panic attacks because of Marcus's misconduct and subsequent interactions. She sought counseling and *may have* experienced Post-Traumatic Stress Disorder as a result of Marcus misconduct.

52.     Cheryl subsequently met Jon, and the two began a relationship. They did not talk to anyone about their relationship, as she did not want their relationship to be an "issue" for Marcus or the subject of gossip within the department.

53.     Eventually, Marcus began making comments to Cheryl such as, "Oh, you're going to see your boyfriend. I hope he's satisfying you" and "I hope he's better than we would have been together."

54.     After Cheryl and Jon were married on 13 September 1980, the two went to Europe for approximately 1.5 years to conduct field work. While Cheryl's anxiety was getting worse, she did not want to say anything to Jon because Marcus was still *his* advisor.

55.     On one occasion, Marcus appeared at the Public Record Office in London, where Cheryl was assisting in Jon's Ph.D. research. He said to Cheryl, "I guess I don't have to ask you how your sex life is anymore."   Cheryl had a horrible panic attack later that night.

56.     After Cheryl and Jon returned to MSU in 1984, Cheryl began working as an MSU employee in the library with Richard Chapin, Ph.D.  Dr. Chapin was the Director of Libraries at MSU from 1959 through 1988. He passed away in 2009.

57.      At some point, Dr. Chapin began showing Cheryl centerfolds of pornographic magazines, asking her and other female staff members if they had seen the new edition for the month, and inquiring whether they had tried certain sexual positions with their significant others.

58.     When Cheryl reported Dr. Chapin's behavior to her supervisor, she was told that if she wanted to keep her job, she should not bring this up again.

59.     Based on the conversation with her supervisor, Cheryl believed that she was not the only one who had complained about Dr. Chapin.

60.     Dr. Chapin's misconduct caused Cheryl's anxiety and panic attacks to worsen.

61.     Meanwhile, Cheryl continued to have problems with Marcus, with whom her husband continued to work.

## SPECIFIC FACTUAL ALLEGATIONS AS TO JON EDWARDS

62.     Plaintiffs herby repeat and reallege the allegations contained in the previous paragraphs and fully incorporate them as set forth in length.

63.     Jon began his graduate studies in African History at MSU in 1975. He chose MSU after being offered a "National Defense Foreign Language Grant" and because several faculty members had research interests in Ethiopia, where Jon had spent time.

64.     From virtually the moment Jon set foot on MSU's campus, Marcus confronted him to a barrage of sexually charged questions and comments and other sexually laden conversations.   Within minutes of meeting Jon for the first time, Marcus asked "how is your sex life?"

65.     As part of his course of instruction, Jon was required to attend office hours with Marcus once a month. During nearly every visit, Marcus would start by asking Jon about his dating life and would then proceed to tell Jon about his own "conquests." During one such conversation, Marcus told Jon about techniques he used during oral sex.

66.     Jon was trapped during these conversations in Marcus's office.  As his advisor, Marcus had immense power over Jon's life.  Jon considered and then rejected the idea of complaining to other faculty members in the department, worried about the consequences.

67.     After one of Marcus's long-term relationships ended, Marcus lost weight and began encouraging female students to attend his graduate seminars. Marcus seemingly viewed MSU as his own sexual playground and did not care if girls were old, young, black or white. Marcus pursued them all.

68.     Marcus regularly hosted parties for his students. The parties included students and whomever Marcus was in a relationship with at the time, typically between 30 and 50 people

total.   Marcus often invited all the graduate students from the History Department to his parties, as well as female undergraduate students from the department. Marcus was always looking for sexual encounters and regularly invited young, attractive and naïve female students to his parties.

69.     During one of these parties, Marcus asked Jon to tell him about a female friend of his.  Marcus commented, "I just had my hand down her pants in her pussy."

70.     Jon attended a party with Marcus in Sweden, where many young Swedish girls were working. Marcus tried to invite each of the young women to go back to his hotel. Marcus's advances included very publicly touching the women in cringe-worthy fashion.

71.     Jon originally attended Marcus's parties because he thought it was an obligation. He began, however, to attend less and less.  As it happened, Jon's first social interaction with Cheryl occurred at one of Marcus's parties.

72.     While Jon was at MSU, a female Japanese faculty member sued Marcus for sexual harassment.

73.     A lawsuit was filed in the Circuit Court for Ingham County, Michigan in November 1987 by Atsuko Hirai, Ph.D., a female Japanese faculty member, against [Marcus and] MSU (the "Hirai Lawsuit").

## MSU'S MISCONDUCT

74.     Plaintiffs herby repeat and reallege the allegations contained in the previous paragraphs of the Complaint and fully incorporate them as set forth in length.

75.     In the mid-70s, it was well-known within the University community that the History Department, housed in Morrill Hall, was a hotbed of sexual activity involving professors and their students.  At least one former wife of Marcus's called the building "Immoral Hall".

76.     No later than 1987, MSU was put on notice of predatory misconduct in the History Department by the Hirai Lawsuit.

77.     Despite the Hirai Lawsuit and other complaints to MSU employees, agents, and representatives, the concerns and allegations regarding inappropriate sexual behavior went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

78.     Because MSU took no action to investigate these complaints and took no corrective action, Marcus's misconduct, among others, continued unchecked.

79.     In 2014, following receipt of an unrelated complaint regarding a sexual assault on MSU's campus, between 2014 and 2015 the U.S. Department of Education's Office of Civil Rights (hereinafter "OCR") conducted an investigation regarding those allegations, another complaint regarding sexual assault and retaliation from 2011, and MSU's response to said complaints, and their general policies, practices, and customs pertaining to their responsibilities under Title IX.

80.     The OCR concluded their investigation in 2015 and presented MSU with a twenty-one-page agreement containing measures and requirements to resolve the 2011 and 2014 complaints and to bring MSU in compliance with Title IX.

81.     The OCR implicitly determined that, prior to 2015, MSU had not been in compliance with Title IX.

82.     The Edwards filed their complaint regarding Marcus's behavior on February 26, 2018.

83.     Upon information and belief, MSU investigated the Edwards' complaint through their Office of Institutional Equity ("OIE").

84.     OIE opened and closed its investigation into the Edwards' complaint on the same day.

85.     On information and belief MSU retained the services of Kroll Associates, Inc. which conducted an investigation and confirmed that allegations made by Plaintiff.

86.     It's final investigation report dated 12 June 2019 Kroll concluded in its Summary of Findings as follows:  After investigation and review of available evidence, Kroll finds a preponderance of the evidence supports that Respondent sexually harassed Claimant J. Edwards in violation of the 1971-1973 Policy and the 1980 Policy, with guidance from the current RVSM. The evidence established that Respondent engaged in unwelcome behavior of a sexual nature; specifically, Respondent made a series of unwelcome and persistent sexually explicit statements or stories that were not legitimately related to his employment duties, course content, research, or other University programs or activities. As to Claimant C. Edwards, we find a preponderance of the evidence supports that Respondent violated the 1971-1973 Policy by making sexual advances towards Claimant C. Edwards against her will and repeatedly directing sexually inappropriate comments towards her while she was an undergraduate student at MSU.

## <u>COUNT ONE</u>

### VIOLATIONS OF TITLE IX AS TO CHERYL EDWARDS
**20 U.S.C. §1681(a),** *et seq.*

87.     Plaintiffs herby repeat and reallege the allegations contained in the previous paragraphs of the Complaint and fully incorporate them as set forth in length.

88.     Title IX's statutory language states, "No *person* in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance."

89.     Plaintiffs are "persons" under the Title IX statutory language.

90.     MSU receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX.

91.     MSU is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

92.     The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students and third parties.

93.     Marcus's actions and misconduct were carried out under the banner of MSU's educational activities.

94.     Marcus's misconduct and actions toward Cheryl and Jon constitutes sex discrimination under Title IX.

95.     MSU failed to carry out their duties to investigate and take corrective action under Title IX following the complaints of sexual assault, abuse, and molestation.

96.     MSU failed to adequately supervise or otherwise ensure Marcus complied with the newly imposed institutional guidelines even though MSU had actual knowledge that Marcus posed a substantial risk of additional sexual abuse of the females whom he had unfettered access.

97.     MSU acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by failing to investigate and address the prior allegations as required by Title IX; and by failing to institute corrective measures to prevent Marcus from violating and sexually abusing other students and individuals.

98.     MSU acted with deliberate indifference as its lack of response to the allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of the known circumstances.

99.     MSU' deliberate indifference was confirmed by the Department of Education's investigation into MSU's handling of sexual assault and relationship violence allegations which revealed:

      a.   That a sexually hostile environment existed and affected numerous students and staff on MSU's campus; and

      b.   That MSU's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner caused and may have contributed to a continuation of the sexually hostile environment.

100.    MSU's responses were clearly unreasonable as Marcus continued to sexually assault individuals until he retired from MSU.

101.    Between 1976 and 20--, MSU acted in a deliberately indifferent, grossly negligent, and/or reckless manner when they failed to reasonably respond to Marcus's sexual assaults and sex-based harassment of Plaintiffs on and off school premises.

102.    MSU' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received repeated notice of Marcus's wrongdoing subjected Plaintiffs and countless others to further sexual harassment and sexual assaults as well as a sexually hostile environment—effectively denying them all access to educational opportunities at MSU.

103.     As a direct and/or proximate result of MSU's actions and/or inactions, Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, [pregnancy and miscarriage and sequelae thereto,] shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, trauma, loss of enjoyment of life, post-traumatic stress disorder resulting in physically

manifested injuries including [anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries]. Plaintiffs were prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain loss of earnings and earning capacity.

104.    In the alternative, the actions or inaction of MSU was deliberately indifferent or so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer the injuries detailed above.

**WHEREFORE**, Plaintiffs, Cheryl and Jon Edwards demand judgment against Defendants, Michigan State University and others to be identified, for compensatory damages, punitive damages, plus pre-judgment interest, post-judgment interest, attorney's fees and costs of suit, and such other relief determined just and equitable by the Court.

## COUNT TWO

### VIOLATIONS OF TITLE IX AS TO JON EDWARDS
### 20 U.S.C. §1681(a), *et seq.*

105.    Plaintiffs herby repeat and reallege the allegations contained in Count One of the Complaint and fully incorporate them as set forth in length.

106.    Marcus's misconduct and actions toward Jon constitutes sex discrimination under Title IX.

107.    Further Marcus, on behalf of MSU, and MSU, wrongfully denied the awarding his successfully defended  Ph.D., subsequently  awared in August 2019, back dated to 19 June 1988 and a hard copy personally delivered by Dean Thomas Jeischko to Jon at his residence on 13 October 2019 and acknowledgement of its continuing oppression of Jon and to coerce Cheryl.

**WHEREFORE**, Plaintiffs, Cheryl and Jon Edwards demand judgment against Defendants, Michigan State University and others to be identified, for compensatory damages, punitive damages, plus pre-judgment interest, post-judgment interest, attorney's fees and costs of suit, and such other relief determined just and equitable by the Court.

## COUNT THREE

### VIOLATION OF CIVIL RIGHTS
### 42 U.S.C. § 1983

108.    Plaintiffs herby repeat and reallege the allegations contained in Count Two of the Complaint and fully incorporate them as set forth in length.

109.    Cheryl, as a female, is a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

110.    Cheryl also enjoys the constitutionally protected substantive due process right to be free from the invasion of bodily integrity through rape, sexual assault, abuse, or molestation under the Fourteenth Amendment to the United States Constitution.

111.    At all relevant times, Marcus was acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or MSU.

112.    The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, including the right to be free from sexual assault, of which reasonable persons in their positions should have known.

113.    At all relevant times, MSU employees had the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives, in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

114.    At all relevant times, certain MSU employees as of yet unknown acted in a
supervisory role to Marcus through their roles at MSU's College of Liberal Arts and other
affiliated MSU departments or institutions.

115.    At all relevant times, MSU had a policy requiring MSU employees to
immediately report suspected child abuse, sexual assault and child pornography.

116.    Ultimately these supervisory MSU employees failed to adequately and properly
investigate the complaints of Plaintiff or other similarly situated individuals including but not
limited to failing to:

**WHEREFORE**, Plaintiffs, Cheryl and Jon Edwards demand judgment against
Defendants, Michigan State University and others to be identified, for compensatory damages,
punitive damages, plus pre-judgment interest, post-judgment interest, attorney's fees and costs of
suit, and such other relief determined just and equitable by the Court.

## COUNT FOUR

### FAILURE TO TRAIN AND SUPERVISE
### 42 U.S.C. § 1983

117.    Plaintiffs herby repeat and rellage the allegations contained in Count Three of the
Complaint and fully incorporate them as set forth in length.

118.    Many different MSU supervisory employees have the ultimate responsibility and
authority to train and supervise their employees, agents, and/or representatives, including
Marcus, and all faculty and staff regarding their duties toward students.

119.    Those employees, as of yet unknown to Plaintiffs, failed to adequately train
faculty and staff, including Marcus, regarding the aforementioned duties which led to violations
of Plaintiffs' rights.

120.    As a result, those same employees deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

121.    As a direct and/or proximate result of those same employees' actions and/or inactions, Plaintiffs suffered and continue to suffer pain and suffering.

**WHEREFORE**, Plaintiffs, Cheryl and Jon Edwards demand judgment against Defendants, Michigan State University and others to be identified, for compensatory damages, punitive damages, plus pre-judgment interest, post-judgment interest, attorney's fees and costs of suit, and such other relief determined just and equitable by the Court.

## COUNT FIVE

### SEXUAL ASSAULT & BATTERY OF CHERYL EDWARDS

122.    Plaintiffs herby repeat and rellage the allegations contained in Count Four of the Complaint and fully incorporate them as set forth in length.

123.    The acts committed by Marcus against Cheryl described herein constitute assault and battery, actionable under the laws of Michigan.

124.    Marcus committed nonconsensual sexual acts which resulted in harmful or offensive contact with Cheryl's body.

125.    Specifically, Marcus committed acts which caused injury to Cheryl by subjecting her to an imminent battery and/or intentional invasions of her right to be free from offensive and harmful contact, and said misconduct demonstrated that Marcus had a present ability to subject Plaintiff to an immediate, intentional, offensive and harmful touching.

126.    Marcus assaulted and battered Plaintiff by his misconduct. Plaintiffs have been damaged thereby.

**WHEREFORE**, Plaintiffs, Cheryl and Jon Edwards demand judgment against Defendants, Michigan State University and others to be identified, for compensatory damages, punitive damages, plus pre-judgment interest, post-judgment interest, attorney's fees and costs of suit, and such other relief determined just and equitable by the Court.

<u>**COUNT SIX**</u>

**VIOLATIONS OF THE ELLIOT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101**

127.    Plaintiffs herby repeat and reallage the allegations contained in Count Five of the Complaint and fully incorporate them as set forth in length.

128.    The Elliot-Larsen Civil Rights Act ("Elliot-Larsen") prohibits discrimination based on sex. MCL 37.2102.

129.    "Discrimination because of sex includes sexual harassment." MCL 37.2.103(i).

130.    "Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature." MCL 37.2103(i).

131.    Elliot-Larsen protects against sexual harassment in educational institutions. An educational institution shall not "discriminate against an individual in the *full utilization of or benefit* from the institution, or the services, activities, or programs provided by the institution because of . . . sex." MCL 37.2401(a) (emphasis added).

132.    MSU is an educational institution pursuant to MCL 37.2401.

133.    Elliot-Larsen also protects against sexual harassment in places of public accommodation. MCL 37.2302. Under this section, an individual shall not be denied "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of . . . sex." MCL37.2302(a).

134.    MSU is a "place of public accommodation" because its "services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." MCL 37.2301(a).

135.    Plaintiffs are "persons" within the meaning of MCL 37.2103(g).

136.    Marcus's misconduct was carried out under the auspices of MSU's educational program.

137.    Marcus's misconduct toward Plaintiffs denied each the full and equal enjoyment of MSU's services at a place of public accommodation, in violation of Elliot-Larson.

138.    Marcus's misconduct toward each Plaintiff, of nonconsensual sexual contact and/or verbal harassment, constitute sex discrimination under Elliot-Larsen.

139.    As a direct and/or proximate result of MSU's actions and/or inactions, Plaintiffs have experienced and continue to experience pain and suffering [expand].

**WHEREFORE**, Plaintiffs, Cheryl and Jon Edwards demand judgment against Defendants, Michigan State University and others to be identified, for compensatory damages, punitive damages, plus pre-judgment interest, post-judgment interest, attorney's fees and costs of suit, and such other relief determined just and equitable by the Court.

## <u>COUNT SEVEN</u>

### GROSS NEGLIGENCE
### M.C.L. § 600.1407(2)(c)

140.    Plaintiff herby repeat and reallage the allegations contained in Count Six of the Complaint and fully incorporate them as set forth in length.

141.    MSU's misconduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

142.    MSU's misconduct demonstrated a willful disregard for substantial risks to Plaintiff.

143.    MSU breached duties owed to Plaintiff and was grossly negligent when Marcus's behavior went unchecked.

144.    Plaintiffs have been damaged thereby.

**WHEREFORE**, Plaintiffs, Cheryl and Jon Edwards demand judgment against Defendants, Michigan State University and others to be identified, for compensatory damages, punitive damages, plus pre-judgment interest, post-judgment interest, attorney's fees and costs of suit, and such other relief determined just and equitable by the Court.

## COUNT EIGHT

### PER QUOD FOR JON EDWARDS

145.    Plaintiffs herby repeat and rellage the allegations contained in Count Seven of the Complaint and fully incorporate them as set forth in length.

146.    Plaintiff Jon Edwards is the lawful spouse of Plaintiff Cheryl Edwards and has been for all times relevant to this action.

147.    Plaintiff Jon Edwards was caused suffer a loss of society, consortium, companionship and otherwise directly damaged, per quod, when Plaintiff Cheryl Edwards was assaulted and continues to be injured.

**WHEREFORE**, Plaintiffs, Cheryl and Jon Edwards demand judgment against Defendants, Michigan State University and others to be identified, for compensatory damages, punitive damages, plus pre-judgment interest, post-judgment interest, attorney's fees and costs of suit, and such other relief determined just and equitable by the Court.

## COUNT NINE

## PER QUOD FOR CHERYL EDWARDS

148.     Plaintiffs herby repeat and rellage the allegations contained in Count Eight of the Complaint and fully incorporate them as set forth in length.

149.     Plaintiff Cheryl Edwards is the lawful spouse of Plaintiff Jon Edwards and has been for all times relevant to this action.

150.     Plaintiff Cheryl Edwards was caused suffer a loss of society, consortium, companionship and otherwise directly damaged, per quod, when Plaintiff Jon Edwards was harassed.

**WHEREFORE**, Plaintiffs, Cheryl and Jon Edwards demand judgment against Defendants, Michigan State University and others to be identified, for compensatory damages, punitive damages, plus pre-judgment interest, post-judgment interest, attorney's fees and costs of suit, and such other relief determined just and equitable by the Court.

## DAMAGES AS FOR CHERYL EDWARDS

151.     Plaintiffs reallege and incorporate by reference the allegations contained in the Count Nine of the Complaint and fully incorporate them as set forth in length.

152.     As a direct and/or proximate result of Defendants' misconduct, actions, or inactions, Plaintiff has suffered and continues to suffer pain and suffering, [pregnancy and miscarriage and sequelae thereto], pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from

performing Plaintiff's daily activities and obtaining the full enjoyment of life, and have sustained

and continue to sustain loss of earnings and earning capacity.

153.    The misconduct, actions and/or inactions of Defendants as alleged in the above

stated counts and causes of action constitute violations of Plaintiff's Constitutional and Federal

rights as well as the common and/or statutory laws of the State of Michigan, and the United

States District Court has jurisdiction to hear and adjudicate said claims.

154.    In whole or in part, as a result of some or all of the above actions and/or inactions

of Defendants, Plaintiffs have and continue to suffer irreparable harm as a result of the

violations.

## DAMAGES AS FOR JON EDWARDS

155.    Plaintiffs herby repeat and reallege the allegations contained in Count Nine of the

Complaint and fully incorporate them as set forth in length.

156.    The amount in controversy for each Plaintiff well exceeds the jurisdictional

minimum of $75,000.00.

WHEREFORE, Plaintiffs requests this Court for Judgment in their favor against all

named Defendants on all counts and claims as indicated above in an amount consistent with the

proofs of trial, and seeks against Defendants all appropriate damages arising out of law, equity,

and fact for each or all of the above counts where applicable and hereby requests that the trier of

fact, be it judge or jury, award Plaintiff all applicable damages, including but not limited to

compensatory, special, exemplary and/or punitive damages, in whatever amount the Plaintiff is

entitled, and all other relief arising out of law, equity, and fact, also including but not limited to:

a)    Compensatory damages in an amount to be determined as fair and just under the

circumstances, by the trier of fact including, but not limited to medical expenses, loss of

earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiff's

Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other

damages to be proved;


      b)     Punitive and/or exemplary damages in an amount to be determined as reasonable
or just by the trier of fact;

      c)     Reasonable attorney fees, interest, and costs; and,

      d)     Other declaratory, equitable, and/or injunctive relief, including, but not limited to
implementation of institutional reform and measures of accountability to ensure the safety and

protection of students as appears to be reasonable and just.

## JURY DEMAND

Plaintiffs, CHERYL EDWARDS and JON EDWARDS, demand a trial by jury as to all

issues.


Dated:  February 26, 2020

                              Respectfully submitted,

                              **BRIAN M. CIGE, ESQ.**

                              BRIAN M. CIGE, ESQ.
                              7 East High Street
                              Somerville, NJ 08876
                              (908) 685-3775
                              cigelaw@gmail.com